UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHNELL ALLEN,

                Petitioner,                        Case Number: 05-10304
                                                        Honorable David M. Lawson

v.

CAROL HOWES,

                Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Johnell Allen, presently incarcerated at the Lakeland Men's Correctional Facility in Coldwater, Michigan, has filed through counsel a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petitioner, originally charged with open murder, Mich. Comp. Laws § 750.316, and possession of a firearm in the commission of a felony, Mich. Comp. Laws § 750.227b, was convicted by a jury in the Genesee County, Michigan circuit court of second-degree murder, Mich. Comp. Laws § 750.317, and the firearm charge. The jury apparently rejected his claim of accident. Although the petition raises several issues, the claim common to all of them is a challenge to the Michigan appellate courts' rejection of the petitioner's complaint of ineffective assistance of appellate counsel based on the failure to raise an issue concerning the exclusion of evidence of the murder victim's violent tendencies. The petitioner also claims that exclusion of that evidence at trial deprived him of the right to present a defense. The Court finds that the decision of the state court of appeals did not unreasonably apply or contravene clearly established federal law as determined by the Supreme Court when it concluded that no prejudice resulted from these errors. Therefore, the petition will be denied.

I.

John McMullen was fatally shot on June 11, 1990 in Flint, Michigan. At the time, McMullen was dating Sharon Hunter, the petitioner's ex-girlfriend and mother of his twin children. The children were eighteen months old then and were both present at the scene of the shooting. The petitioner confronted McMullen in Hunter's apartment after hearing that McMullen threatened to beat Hunter and her friend, Wendy Shepherd. In the process, the petitioner pointed a shotgun in McMullen's direction, and he claimed that the gun discharged accidently when McMullen jumped off the top shelf of the closet where McMullen was hiding in anticipation of the petitioner's arrival.

The trial in this case began on October 4, 1990, and several witnesses described the events that led to the encounter between McMullen and the petitioner. Wendy Denise Shepherd testified that on the day in question, she was at Hunter's apartment, where she witnessed Hunter and McMullen arguing. She witnessed McMullen grab Hunter's face and push her down. Shepherd testified that she told Hunter she should see other men and that in response, McMullen told her: "I ought to fuck you up and I ought to beat your ass and all this." Trial Tr. Vol. II, p. 34. Shepherd said that McMullen then told Hunter to come upstairs where, she believed, he was going to "jump" on Hunter. Shepherd was afraid that McMullen might "jump" on her, too. Trial Tr. Vol. II, pp. 33, 36. When Shepherd tried to call for help, McMullen ripped out the phone cord. Shepherd then called her boyfriend Hodo (who is the petitioner's cousin), but she was unable to reach him on his cell phone.

She then left the apartment and ran into Hodo, accompanied by the petitioner. Shepherd told Hodo and the petitioner what had occurred. Hodo and the petitioner then left in the petitioner's truck and went to Hunter's apartment. Shepherd testified that the petitioner had a shotgun in his

possession.  She said that she followed them back to the apartment because she was afraid that something bad was going to happen.  When she arrived at the apartment she heard a gunshot, and a few minutes later, she saw the petitioner come out of the apartment carrying a shotgun.  Shepherd testified that Hunter and the petitioner's twin children were present during the incident.

Demond Pryor testified that he was outside playing basketball when he noticed a speeding truck.  The truck pulled up to the apartment complex and a man carrying a long gun jumped out.  Pryor said the man ejected a shell from the gun and said, "why did you mess with my . . . ," but Pryor could not discern the end of the phrase.  Pryor subsequently heard a gunshot and a woman screaming.

Officer Thomas Ridley and his partner of the Flint Police Department responded to a radio call and were the first officers to arrive at the scene of the shooting.  When they arrived, they went upstairs and saw two women in the bedroom crying, and a man in the closet, lying on the back of a shelf, with a "gunshot wound to the side of his neck and it looked like a wound to his chest."  Trial Tr. Vol. III, p. 6.  Ridley saw that the closet doors were off their hinges and lying on the floor near the closet.

Douglas Hodo, the petitioner's cousin, testified Shepherd called his pager that day but he did not return her call.  Shortly thereafter, while he and the petitioner were driving down the street, they came upon Shepherd, who had tears in her eyes.  Shepherd told them that McMullen had been "beating on" Hunter in front of the kids and then "messing" with the kids – "I don't know what kind of way."  Trial Tr. Vol. III, p. 14.  Hodo testified that he and the petitioner then went to Lynn Gordon's house (where the petitioner would sometimes stay) to try to call Hunter.  When no one answered the phone, they drove over to Hunter's apartment.

-3-

Hodo said that he did not see the petitioner with a shotgun until the petitioner got out of the truck in front of Hunter's apartment. Hodo said that when they entered the apartment, Hunter told him to grab the babies. It was Hodo's testimony that Hunter tried to stop the petitioner from going upstairs but could not. Hodo then heard a shot.

Darlene Burkett, another witness for the prosecution, testified that on that day she and her children were visiting with a couple of other friends outside of her house close to where Hunter lived. Burkett saw the petitioner drive up in a black-and-white truck and, in some time, come out of another person's apartment with a shotgun, placing it in the front seat of the truck. Burkett said that the petitioner then drove to the back of Hunter's apartment. When Burkett approached Hunter's apartment, she heard some yelling and cursing, followed by the sound of a gunshot. Burkett said that

when she entered the building and went upstairs, she saw Hunter, who was hysterical, and McMullen lying in the closet on a shelf with blood gushing from his throat.

Sharon Hunter testified that she had been dating McMullen for about a month prior to his murder. She said that on the date of the murder, she had gotten into an argument with him, and that Shepherd also got involved in the argument. Hunter said that McMullen grabbed her by her face and pushed her down. She confirmed that when Shepherd attempted to use the phone, McMullen pulled the phone cord from the wall. Hunter apparently left the apartment, and testified that McMullen then wanted her to come upstairs to finish the argument; he even tried to pick her up to carry her upstairs. At that point, Hunter gave in and walked upstairs, and the argument between them was settled.

-4-

Hunter recounted that the petitioner showed up at her apartment about twenty minutes later. She remembered that she was sweeping the floor when she saw the petitioner come into the apartment with a gun in his left hand.  Hunter told the petitioner to get out, but he pushed her away, yelling, "Where is John McMullen," and, "Why was he messing with my children."  Trial Tr. Vol. III, pp. 72, 103.  Hunter testified that the petitioner appeared to be very upset and angry.

Hunter testified that the petitioner found McMullen hiding on a shelf in the closet.  She said that the petitioner was pulling at McMullen's shirt and yelling at him, expressing concern for his two eighteen-month-old children.  She testified that as the petitioner was pulling on McMullen to come out of the closet, McMullen grabbed the gun and the gun went off.  Hunter said that one of the twins was in the room during the shooting, although she did not realize that until she heard the child crying.

Hunter also testified that McMullen had been physically abusive with her on previous occasions, including attempting to choke her once, and that she had asked the petitioner for a gun so that she could protect herself.  However, the prosecutor objected to the testimony and the trial court sustained the objection.  Defense counsel, nevertheless, argued to the trial court:

> Your Honor, my client's state of mind is going to be a substantial issue in this case in terms of what he had in mind when he went to the scene with the gun.  Part of his state of mind is influenced by what he had learned from this witness and what he discussed with her relative to her safety and the safety of his children.

Trial Tr. Vol. III, p. 95.

Hunter testified as follows on redirect examination:

Q.     [By the prosecutor]  You testified on cross-examination that you had told Johnell Allen in the past that you had been physically assaulted by John McMullen, is that right?

A.     Yes.

Trial Tr. Vol. III, p. 114.

The petitioner's first witness was Davina Donhee, a friend of Sharon Hunter. Donhee testified that Hunter told her that the gun went off when McMullen jumped down from the shelf in the closet.

The petitioner testified in his own defense, explaining that his former girlfriend, Sharon Hunter, had told him that the decedent, McMullen, had been abusive to her. The prosecutor objected and the trial court ruled that it would not allow that testimony because there was no way of testing its veracity. Nevertheless, the petitioner proceeded to testify that on the day of the shooting, he and Hodo came upon Shepherd walking down the street while driving near Hunter's apartment. Apparently, Shepherd told them that McMullen had beaten Hunter and that he was "messing" with Hunter's children. The petitioner said that he then had a terrible feeling that something was wrong. He tried to phone Hunter to see what was happening, but no one answered the phone. The petitioner stated that he panicked and grabbed his shotgun and headed over to Hunter's apartment, yelling, "Where is he and why is he messing with my babies." Trial Tr. Vol. IV, p. 42.

The petitioner testified that when he got to Hunter's apartment, he ran up the stairs and found McMullen in the closet on a shelf. He said that he grabbed him by the shirt and said, "Man, are you crazy? . . . why are you fucking with my kids?" Trial Tr. Vol. IV, p. 46. The petitioner said that he told McMullen to come out of the closet, and, as McMullen was jumping off the ledge, McMullen put his hand on the barrel of the gun, the barrel hit him, and the gun went off. The petitioner yelled, "Oh my God," and walked out of the house, throwing the gun down. Trial Tr. Vol. IV, p. 48. The petitioner, who is right-handed, claims to have been holding the shotgun only with his left hand or under his arm.

-6-

The petitioner then testified about McMullen's prior abusive conduct, but the prosecutor objected to introduction of that testimony, which the court sustained.   Defense counsel made the following argument outside the jury's presence:

> May it please the Court, the state of mind of my client as of the time of the incident on June 11th is very significant in terms of his conduct and his state of mind impacted by knowledge that was given to him by any other person.  His knowledge of the conduct and character of the decedent is significant in terms of his state of mind when he acted as he did on June the 11th.

Trial Tr. Vol. IV, p. 25.  Defense counsel then made an offer of proof that the petitioner would testify that on a previous occasion, he received a telephone call from Hunter indicating that McMullen had threatened to kill her and the petitioner's children.  The petitioner would also testify that after his discussion with Hunter, he instructed her to call the police.  The petitioner would testify that on another occasion, Hunter called him and told him that McMullen had "pinned her and her babies up."  Trial Tr. Vol. IV, pp. 27-28.  At that time, the petitioner suggested to Hunter that she obtain an injunction against McMullen.   The trial court ruled that the testimony would be inadmissible hearsay and barred the petitioner from testifying about his knowledge of McMullen's prior abusive behavior.

During trial, the prosecution acknowledged that the only testimony from the eyewitnesses – the petitioner himself and Hunter – suggested that the gun discharged when McMullen fell into it and grabbed it as he jumped off the shelf.  That testimony was consistent with the prosecution's forensic expert who opined that the gun barrel was in contact with McMullen when it went off. Nevertheless, the prosecutor argued during the closing arguments as follows:

> Now, Mr. O'Rourke said that Allen had been told that McMullen was a violent person.  Allen had been told that McMullen was a violent person.  You're the person that has to correct me, but I really don't remember any witness, Sharon Hunter, Hodo, Wendy Shepherd, any of those people using the term violent.  I really don't.

. . .
I don't remember any of them [sic] people talking about him as a violent person.
Now, just because he throws this – Mr. O'Rourke got this from his own client and
he's able to argue that or go over that with you. But you have to remember he got
[sic] the right to argue that with you. And legally he got that position from his client,
nobody else. Because his client is the only person that said that. So don't be fooled
by that. Remember none of those other people talked about violence.

Trial Tr. Vol. IV, pp. 131-132.

Following the jury's guilty verdict, the trial court sentenced the petitioner as a second
habitual offender to thirty to sixty years' imprisonment on the second-degree-murder count and a
consecutive two-year prison term for the felony firearm conviction.

The petitioner appealed to the Michigan Court of Appeals, which affirmed the conviction on
June 2, 1993. *People v. Allen*, No. 136139 (Mich. Ct. App. June 2, 1993) (unpublished). He then
filed an application for leave to appeal in the state supreme court but missed the deadline, and the
supreme court returned the petitioner's application as being untimely filed. On April 23, 1997, one
day before the statute of limitations would have run on his habeas petition, the petitioner filed a
motion for relief from judgment in the trial court under Michigan Court Rule 6.500 *et seq.* On
February 6, 2003, the state trial court granted the petitioner's motion, concluding that the petitioner
received ineffective assistance of appellate counsel in violation of the Sixth Amendment. *People v.
Allen*, No. 90-43372-FC (Genesee County Cir. Ct. Feb. 7, 2003). That court vacated the petitioner's
convictions and sentences on the ground that the petitioner's appellate counsel was ineffective for
failing to challenge the trial court's ruling prohibiting testimony that the petitioner knew of the
victim's past violent history and conduct. The trial court acknowledged, however, that there was
testimony before the jury from the petitioner and his former girlfriend, Sharon Hunter, that the
petitioner had some knowledge of the victim's violent character and conduct before the murder.

-8-

The State then appealed to the court of appeals; its appeal was denied on May 12, 2003 for lack of merit in the grounds presented. *People v. Allen*, No. 247621 (Mich. Ct. App. May 12, 2003). The State then appealed to the Michigan Supreme Court, which remanded the case to the court of appeals "for consideration as on leave granted." *People v. Allen*, 469 Mich. 853, 666 N.W.2d 665 (2003). Upon reconsideration by another panel, the Michigan Court of Appeals reversed the trial court's grant of relief, *People v. Allen*, No. 249788, 2005 WL 1106498 (Mich. Ct. App. May 10, 2005) (unpublished), and on November 29, 2005, the Michigan Supreme Court denied leave to appeal. *People v. Allen*, 4747 Mich. 936, 706 N.W.2d 15 (2005). The petitioner filed a motion for reconsideration, which also was denied. *People v. Allen*, 474 Mich. 1023, 708 N.W.2d 424 (2006).

In the habeas corpus petition filed November 30, 2005, the petitioner raised two issues: the exclusion of evidence of his knowledge of the victim's violent tendencies violated the petitioner's right to present a defense, contrary to the Due Process Clause and the Sixth Amendment; and his right to the effective assistance of appellate counsel was violated. In a brief filed later, the petitioner expanded on the second issue as follows:

I.      Whether counsel on direct appeal was constitutionally ineffective for failing to argue error in the state trial court's exclusion of evidence, relevant to [the petitioner's] state of mind, that would have allowed the jury to infer that [the petitioner] did not have the "malice" necessary for a conviction of murder when:

  A.      Preclusion of that evidence constituted error under the Constitution and state evidentiary law; and

  B.      A constitutionally adequate attorney would have presented these argument and, thereby, would have obtained reversal of [the petitioner's] conviction.

II.     Whether the Michigan Court of Appeals' conclusion of a lack of prejudice to the trial proceedings as a sufficient basis for denying a claim of ineffective

-9-

assistance of appellate counsel is contrary to and/or an unreasonable application of United States Supreme Court precedent.

III.     Whether there is no deference to the state court fact finding under the AEDPA where the Michigan Court of Appeals' conclusion that the precluded evidence, involving [the petitioner's] state of mind based on his knowledge of the decedent's prior death threats and other violent behavior that occurred well before the date of the incident herein, was cumulative when there was no other evidence of the decedent's violent behavior – other than his behavior immediately prior to the incident leading to his death.

IV.     Whether there is no deference, with regard to the competence prong of *Strickland*, to the state court proceedings where none of the state courts presented any analysis with regard to this issue.

The respondent has filed an answer asserting that the claims lack merit because the decision of the Michigan Court of Appeals did not result in an objectively unreasonable application of clearly established Supreme Court law.

## II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering applications for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003). As amended, 28 U.S.C. § 2254(d) imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

-10-

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Therefore, federal courts normally are bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law. *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (internal quotes omitted)). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (stating that "[t]he court gives complete deference to state court findings of historical fact unless they are clearly erroneous").

The Supreme Court has explained the proper application of the "contrary to" clause as follows:

A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .

A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams*, 529 U.S. at 405-06.

-11-

The Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause of § 2254(d)(1) "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409. The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . .
>
> [A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409-11; *see also Murphy v. Ohio*, 551 F.3d 485, 493-94 (6th Cir. 2009); *Eady v. Morgan*, 515 F.3d 587, 594-95 (6th Cir. 2008); *Davis v. Coyle*, 475 F.3d 761, 766-67 (6th Cir. 2007); *King v. Bobby*, 433 F.3d 483, 489 (6th Cir. 2006); *Rockwell v. Yukins*, 341 F.3d 507, 512 (6th Cir. 2003) (en banc).

Although the petitioner has separated his claims into a number of discrete arguments, the petition actually presents two general issues. The first is whether the trial court's evidentiary rulings deprived the petitioner of his constitutional right to present a defense. The second is whether the performance of his appellate attorney deprived the petitioner of his right to the effective assistance of appellate counsel guaranteed by the Sixth Amendment, since the lawyer failed to raise these evidentiary issues on direct appeal. Based on the state courts' resolution of these issues, the petitioner's claims here are reduced to a single issue: whether the Michigan Court of Appeals's determination that the petitioner suffered no prejudice from the exclusion of the evidence reasonably applies Supreme Court law. The reason this single issue remains is straightforward. Both the state

-12-

trial court and court of appeals determined that the ruling that excluded the evidence of the victim's past violent tendencies was erroneous. Consequently, whether the petitioner suffered a constitutional deprivation, either from the exclusion of the evidence itself or from his appellate lawyer's miscue, depends on whether he suffered prejudice.

The petitioner also argues that the state courts' finding of no prejudice was incorrect and is not entitled to deferential review. However, the Court does not necessarily apply the AEDPA when undertaking such review. In *Fry v. Pliler*, 551 U.S. 112, 127 S. Ct. 2321 (2007), the Supreme Court held that a federal habeas court "must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht* [*v. Abrahamson,* 507 U.S. 619 (1993)], whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman* [*v. California*, 386 U.S. 18 (1967)]." 127 S. Ct. at 2328. *Fry* overruled *Eddleman v. McKee,* 471 F.3d 576, 583 (6th Cir. 2006), where the Sixth Circuit concluded that "AEDPA replaced the *Brecht* standard with the standard of *Chapman* plus AEDPA deference when, as here, a state court made a harmless-error determination." *Wilson v. Mitchell*, 498 F.3d 491, 503 (6th Cir. 2007) (quoting *Eddleman*, 471 F.3d at 583).

Therefore, to resolve the petitioner's claim that he was deprived of an opportunity to present a defense, the Court must determine whether the exclusion of the evidence "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (internal quotations omitted). To resolve the claim of ineffective assistance of appellate counsel, the Court must determine whether the deficient performance prejudiced the petitioner's direct appeal, that is "but for his counsel's unreasonable failure [to raise an appellate issue], [the petitioner] would have

prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285-286 (2000); *Strickland*, 466 U.S. at 687; *Mapes v. Coyle*, 171 F.3d 408, 427-28 (6th Cir. 1999); *see also Franklin v. Anderson*, 434 F.3d 412, 429 (6th Cir. 2006).

A.

Turning to the first category of issues, the petitioner believes that the exclusion of the following evidence prevented him from presenting a valid defense to the murder charge: testimony from Sharon Hunter that John McMullen had been physically abusive to her on previous occasions, including attempting to choke her once, and that she had asked the petitioner for a gun so that she could protect herself; and the petitioner's own testimony that Sharon Hunter had told him that McMullen had been abusive to her; that on a previous occasion he received a telephone call from Hunter indicating that McMullen had threatened to kill her and the petitioner's children, and he instructed her to call the police; and that on another occasion Hunter called him and told him that McMullen had "pinned her and her babies up," after which the petitioner suggested to Hunter that she obtain an injunction against McMullen. The trial judge excluded the evidence on hearsay grounds, but the petitioner maintained that he offered the evidence to show his state of mind to negate the State's allegation of malice, an essential element of murder. The trial court also held that the petitioner's counsel could not elicit such testimony regarding McMullen's general reputation for violence.

The state courts determined that these evidentiary rulings were incorrect. Commenting on the circuit court's decision on the petitioner's post-conviction motion, the court of appeals stated:

> The circuit court found that the trial judge erred in excluding evidence of what defendant heard about decedent's violent propensities because the evidence was offered to show defendant's state of mind, and not for the proof of the matter offered.

-14-

> In this regard, the circuit court was correct.  The evidence should have been admitted
> for the reasons stated by the circuit court.

*People v. Allen*, 2005 WL 1106498, at * 1.  However, the bad evidence call by the trial court does

not necessarily entitle the petitioner to habeas relief.

To be sure, errors in state evidence law will not support the issuance of the writ unless those

errors rendered the trial fundamentally unfair.  *See Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir.

1994) (holding that "[h]abeas review does not encompass state court rulings on the admission of

evidence unless there is a constitutional violation").  The Court of Appeals for the Sixth Circuit has

explained that

> "[e]rrors in the application of state law, especially rulings regarding the admission or
> exclusion of evidence, are usually not to be questioned in a federal habeas corpus
> proceeding." *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988).  Generally, state-
> court evidentiary rulings cannot rise to the level of due process violations unless they
> "offend[] some principle of justice so rooted in the traditions and conscience of our
> people as to be ranked as fundamental." *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)
> (quoting *Patterson v. New York*, 432 U.S. 197, 202 (1977)); *see also Spencer v. Texas*,
> 385 U.S. 554, 563-64 (1967).

*Seymour v. Walker,* 224 F.3d 542, 552 (6th Cir. 2000) (second alteration in original).  However, the

petitioner has raised an issue of constitutional dimension when he alleged that the exclusion of the

evidence actually contravened his right to present a defense, incorporated in the Sixth Amendment.

The Compulsory Process Clause of the Sixth Amendment provides an accused with the right

to "compulsory process for obtaining witnesses in his favor,"  U.S. Const. amend VI, a crucial part

of the Constitution's more basic guarantee of  "a meaningful opportunity to present a complete

defense."  *California v. Trombetta*, 467 U.S. 479, 485 (1984).  As applied to the states by the Due

Process Clause of the Fourteenth Amendment, the accused has the right at trial to present testimony

that is "relevant," "material," and "vital to the defense."  *Washington v. Texas*, 388 U.S. 14, 23

(1967); *see also Crane v. Kentucky,* 476 U.S. 683, 690 (1986) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'") (internal citations omitted). The "right to present relevant evidence is not unlimited," and "is subject to reasonable restrictions" imposed by the criminal process. *United States v. Scheffer*, 523 U.S. 303, 308 (1998).

> As a result, state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not "arbitrary" or "disproportionate to the purposes they are designed to serve." Moreover, we have found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused.

*Ibid* (internal citations and quotation omitted).

In *Washington v. Texas*, the petitioner was convicted of malicious murder arising from the shooting of the mother of his ex-girlfriend. Both Washington and one Charles Fuller were present when the gun was fired. Washington testified at his trial that he did not shoot the deceased, and had in fact been running back to his vehicle when he heard a shot ring out, presumably discharged by Fuller. Fuller was not allowed to corroborate this version of events at trial because he had earlier been convicted of the same murder, and under Texas evidence law persons charged as accomplices in the same crime were not permitted to testify on behalf of one another. The petitioner's conviction was upheld by the Texas courts, but the Supreme Court reversed, finding that "the right to present . . . witnesses to establish a defense . . . is a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. at 19. The Court found the Texas rule that prohibited the accomplice from testifying for his co-participant, but not the prosecution to be "absurd" and "arbitrary," ruling that

-16-

"[t]he Framers of the Constitution did not intend to commit the futile act of giving to a defendant the right to secure the attendance of witnesses whose testimony he had no right to use." *Id.* at 23.

A similar problem arose in *Chambers v. Mississippi*, 410 U.S. 284 (1973), where the defendant was tried for the murder of a police officer. The defendant was accused after evidence established that the slain deputy had discharged his firearm at his likely assailant and that Chambers had been struck by one of the bullets. Chambers insisted that he was innocent, and demanded to call at trial one Gable McDonald, who initially confessed to the shooting to Chambers's attorneys, but later recanted at a preliminary examination. At trial, Chambers sought to prove not only that he did not shoot the officer, but that McDonald did. Although he was able to present testimony that McDonald was in fact the shooter, he was not able to call McDonald to the stand himself because of Mississippi's common-law "voucher" rule, which provided that a party could not impeach his own witness. Furthermore, the trial court refused to permit Chambers to call three witnesses who would have testified that McDonald confessed to them as well because Mississippi did not recognize a hearsay exception for statements against penal interest.

The Supreme Court concluded that Chambers's inability to call and cross-examine McDonald, combined with the trial court's prohibition on the introduction of the witnesses' hearsay testimony, violated Chambers's due process rights. With regard to the requested testimony of McDonald, the Court recognized that "the right to confront . . . is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Id.* at 295. As an example of such an interest, the Court cited to *Mancusi v. Stubbs*, 408 U.S. 204 (1972), in which the Court held that the trial court's inability to compel the attendance of a foreign national did not abridge the defendant's right under the Confrontation Clause. Nonetheless, the "denial or significant diminution"

-17-

of this right "calls into question the ultimate 'integrity of the fact-finding process' and requires that the competing interest be closely examined." *Chambers*, 410 U.S. at 295 (quoting *Berger v. California*, 393 U.S. 314 (1969)). Because "the right to confront and to cross-examine those who give damaging testimony against the accused has never been held to depend" on who actually called the witness, the Supreme Court concluded that the voucher rule "plainly interfered with Chambers' right to defend against the State's charges." *Id.* at 298.

The Court found that it need not decide whether the Confrontation Clause violation itself would be enough to reverse the conviction, as Chambers had argued that it was the combination of his inability to cross-examine and his inability to call witnesses that violated his due process rights. *Ibid*; *see also Davis v. Jabe*, 824 F.2d 483, 486 (6th Cir. 1987). Proceeding to the exclusion of the three hearsay witnesses, the Court recognized the State's interest in prohibiting introduction of hearsay generally, but found that such a rule must yield to the defendant's due process interests when sufficient indicia of reliability suggest that the statements were actually made. *Chambers*, 410 U.S. at 302 (noting that because "[t]hat testimony was also critical to Chambers' defense, . . . the hearsay rule may not be applied mechanistically to defeat the ends of justice"). The reliability of the statements was supported by their spontaneity to close acquaintances, their corroboration by other evidence, and the reality that the statements were manifestly against McDonald's penal interest. *Id.* at 300-01. Together "with the State's refusal to permit Chambers to cross-examine McDonald," "the exclusion of this critical evidence" denied Chambers due process of law. *Id.* at 302; *see also Crane v. Kentucky*, 476 U.S. at 689-91 (holding that the state deprived the defendant of his right to due process by denying him the opportunity to present evidence at trial concerning the voluntariness of

his confession on the basis of a state rule permitting such evidence only to be introduced at pretrial hearings).

In *Rock v. Arkansas*, 483 U.S. 44 (1987), the Supreme Court explained that the defendant's right to present a defense at trial trumped not only "arbitrary" state procedural rules, but also those "disproportionate to the purposes they are designed to serve. In applying its evidentiary rules a State must evaluate whether the interests served by a rule justify the limitation imposed on the defendant's constitutional right to testify." *Id.* at 55-56. In *Rock*, the Court addressed an Arkansas rule of evidence that categorically excluded testimony that was derived from hypnosis sessions. Applying the rule, the trial judge had forbidden the defendant from providing any testimony other than that which she had recalled prior to her hypnosis sessions. Although it recognized that several other states applied a similar rule, the Court found that the effect of the rule was to "prevent[] her from describing any of the events that occurred on the day of the shooting, despite corroboration of many of those events by other witnesses." *Id.* at 57. In light of the evidence corroborating the details of the defendant's hypnotically refreshed testimony, the tape recordings of the hypnosis sessions, and the trial court's finding that the hypnotist did not use leading questions, the trial court erred by not weighing the defendant's right to present testimony against the interests advanced by the hypnosis rule. *Id.* at 61-62. Accordingly, the Court vacated the conviction and remanded the matter for further proceedings.

It is clear that the defendant's right to present evidence is not absolute, and that the State may place reasonable limitations on the introduction of evidence in criminal proceedings. *See, e.g., United States v. Scheffer*, 523 U.S. at 305 (holding that the proscription against the introduction of polygraph examination results contained in Military Rule of Evidence 707 did not violate the Due

-19-

Process Clause).  However, the unavoidable conclusion to be drawn from the Supreme Court's cases is that the "the right to present . . . witnesses to establish a defense" is clearly established as "a fundamental element of due process of law."  *See Washington*, 388 U.S. at 19.  State evidence rules must yield to this fundamental right when they "plainly interfere[] with [the defendant's] right to defend against the State's charges," *Chambers*, 410 U.S. at 298, particularly when such rules are "disproportionate to the purposes they are designed to serve."  *Rock*, 483 U.S. at 56.

However, under Supreme Court authority, a violation of the fundamental right to present a defense is not established merely by showing that the trial court excluded evidence relevant to a defense.  Rather, a petitioner must show that the exclusion of evidence "significantly undermined fundamental elements of the accused's defense."  *Scheffer*, 523 U.S. at 315.  Put another way, the exclusion of evidence is unconstitutionally arbitrary or disproportionate "only where it infringed upon a weighty interest of the accused."  *Id.* at 308 (citing *Rock v. Arkansas*, 483 U.S. at 58).  Applying this standard in a habeas corpus case, the Sixth Circuit has held that the right to present a defense is abridged by an evidentiary ruling excluding defense evidence "[o]nly if 'an evidentiary ruling is so egregious that it results in denial of fundamental fairness.'"  *Baze v. Parker*, 371 F.3d 310, 324 (6th Cir. 2004) (quoting *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir.2003)); *accord Alley v. Bell*, 307 F.3d at 394-95 (exclusion of evidence unconstitutional only when it eviscerates a defense).  Therefore, even if exclusion of evidence was erroneous under state law, the constitutional right to present a defense is not abridged unless the evidence was so material that it deprived the defendant of a fair trial.

In this case, the petitioner never presented the defenses of self-defense or defense of others, where evidence of his awareness of the victim's past violent tendencies would have been more

-20-

relevant.  For those defenses under state law, a defendant must show that he had an honest and reasonable belief that he would suffer death or serious injury at the hands of the victim, *see People v. Riddle*, 467 Mich. 116, 119, 649 N.W.2d 30, 34 (2002), or that the victim was the first aggressor, *see People v. Peoples*, 75 Mich. App. 616, 620-22, 255 N.W.2d 707, 709-10 (1977), *abrogated on other grounds by People v. Carines*, 460 Mich. 750, 597 N.W.2d 130 (1999).  Evidence that a defendant knew of a victim's violent acts or reputation would be relevant to show a state of mind consistent with self-defense, and proof of the victim's violent character – regardless of the defendant's knowledge – would be relevant to show that the victim acted in conformity.  *People v. Harris*, 458 Mich. 310, 314-20, 583 N.W.2d 680, 683-85 (1998).  But neither of those defenses appeared to be the focus of the petitioner's theory at trial, and therefore the exclusion of the challenged evidence did not prohibit the petitioner from offering either of these defenses.

Instead, the petitioner's defense was that he did not intend to shoot McMullen, and the shotgun he was carrying when he confronted McMullen discharged accidently.  Therefore, he theorizes, he did not shoot McMullen with "malice," and he is not guilty of murder.  Under Michigan law, malice, as an element of murder, consists of the intent to kill, the intent to do great bodily harm, or the wanton and willful disregard of the likelihood that the natural tendency of actor's behavior is to cause death or great bodily harm.  *People v. Aaron*, 409 Mich. 672, 728, 299 N.W.2d 304, 326 (1980).  Malice may be inferred from the use of a firearm.  *See People v. Fletcher*, 260 Mich. App 531, 562, 679 N.W.2d 127, 146 (2004).  So apparently the petitioner sought to negate the inference that he intended to kill or seriously injure McMullen by showing he had a different reason for bringing his shotgun with him when he initiated the confrontation in Sharon Hunter's apartment – that is, to protect himself if McMullen turned violent.

-21-

But unlike *Washington v. Texas*, *Chambers v. Mississippi*, and *Crane v. Kentucky*, in this case there was other evidence in the record to establish that proposition. Wendy Shepherd testified that she communicated McMullen's violent character to the petitioner on the very day of the shooting. Sharon Hunter testified that she had described to the petitioner McMullen's violent conduct, which in turn led the petitioner to confront McMullen. Hunter testified that on the day in question, McMullen pushed her down by her face, and that he had choked her in the past. And Douglas Hodo testified that when he and the petitioner came upon Shepherd, Shepherd told them that McMullen had been "beating on" Hunter in front of the kids and had been "messing" with the kids. Hodo also testified that, on several occasions, he saw McMullen walking around with a metal exercise bar.

The petitioner himself testified about his knowledge of Hunter's turbulent relationship with McMullen. He said that on the day of the shooting, he and Hodo were driving in his truck when they came upon the crying Shepherd who flagged them down; and that Shepherd told them that McMullen had beaten Hunter and that he was messing with his children. The petitioner explained that he felt "like something was wrong," Trial Tr. Vol. IV, p. 38, which was the reason he then went into his house and grabbed his twelve-gauge shotgun, got back in the truck, and drove to Hunter's house. The petitioner testified to the following:

> Q.  Why did you grab the gun?
> A.  Well, because I was scared.
> Q.  Scared of what?
> A.  I was scared that something had happened bad. And everything just started piling up into me, what was going on.
> Q.  Like what?
> A.  All the conversations I've had with Sharon. All of it started to come to me. And then I thought about what W[e]ndy said I just thought I just thought it was something definitely wrong.

Trial Tr. Vol. IV, p. 40.

-22-

This evidence permitted defense counsel to advance the theory of accident during his closing argument. He described the petitioner's state of mind to the jury in order to persuade them that the shooting was the result of an accident. He argued that when the petitioner heard what Shepherd had to say about the events at Hunter's apartment – where his children were present – the petitioner did not go there immediately, but rather went to Lynn's house, got a gun, and made a phone call. Defense counsel emphasized that the petitioner did not become excited or anxious at that time; it was not until Hodo was unable to reach Hunter by phone. Defense counsel argued that the petitioner's feeling was understandable at that point, given the prior relationship between Hunter and McMullen coupled with Shepherd's reported fear that McMullen was going to beat Hunter. Defense counsel stated that the petitioner then armed himself with the gun "[e]ither to protect himself from the man he had been told was a violent person or just to frighten that person out of the residence," Trial Tr. Vol. IV, p. 119, and he described McMullen's death as an accident.

With the quantum of evidence on the defense theory in the record, the Court must conclude that the petitioner was afforded "a meaningful opportunity to present a complete defense." *Crane*, 476 U.S. at 690 (citation and internal quotations omitted). The state court of appeals held that although the exclusion of the other evidence of McMullen's prior abuse of Hunter was erroneous,

> the [circuit] court erred in concluding that defendant demonstrated the requisite prejudice. Defendant was permitted to introduce ample evidence that he had been made aware that decedent had been physically abusive to Hunter and has been "messing with" the children, and that Hunter wanted to get a gun to protect herself. The additional evidence would have been cumulative.

*People v. Allen*, 2005 WL 1106498, at *1. After reviewing the full record, this Court also finds that exclusion of the evidence did not have a "substantial and injurious effect or influence in determining

-23-

the jury's verdict." *Brecht*, 507 U.S. at 623 (internal quotations omitted).  Therefore, the petitioner is not entitled to a writ of habeas corpus as a result of the trial court's erroneous evidence ruling.

B.

Next, the petitioner alleges that he was denied effective assistance of appellate counsel because appellate counsel failed to raise on direct appeal the arguments that the evidence ruling was erroneous and resulted in the abridgment of his right to present a defense.  The right to effective assistance of counsel includes the right to effective assistance of appellate counsel.  *Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *Carpenter v. Mohr*, 163 F.3d 938, 946 (6th Cir. 1998), *rev'd on other grounds sub nom. Edwards v. Carpenter*, 529 U.S. 446 (2000).  To prevail on a claim of ineffective assistance of appellate counsel, the petitioner must demonstrate that appellate counsel's performance was deficient and that the deficient performance prejudiced the appeal.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  A criminal defendant has no constitutional right to demand that appellate counsel raise every possible colorable issue on appeal.  *Jones v. Barnes*, 463 U.S. 745, 751 (1983). "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."  *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones*, 463 U.S. at 751-52).

Although the Sixth Amendment right to counsel does not require an appellate attorney to raise every non-frivolous issue on appeal, an attorney who has presented strong but unsuccessful claims on appeal may nonetheless deliver a deficient performance by omitting an issue that obviously would have resulted in reversal on appeal.  *Clemmons v. Delo*, 124 F.3d 944, 954 (8th Cir. 1997); *United States v. Cook*, 45 F.3d 388, 395 (10th Cir. 1995); *see also Banks v. Reynolds*, 54 F.3d 1508, 1515 (10th Cir. 1995) (failure to raise a "dead-bang winner" claim on appeal constitutes ineffective

-24-

assistance of appellate counsel even though counsel may have raised other strong but ultimately unsuccessful claims); *Matire v. Wainwright*, 811 F.2d 1430, 1438 (11th Cir. 1987) (appellate counsel may be ineffective where the trial error is obvious from the record and "must have leaped out upon even a casual reading of the transcript"). Although appellate counsel need not raise every nonfrivolous argument on direct appeal, he must exercise reasonable professional judgment. *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003) (citing *Jones*, 463 U.S. at 751-752).

The determination of whether appellate counsel performed deficiently is assessed in light of the familiar eleven factors set forth in *Mapes v. Coyle*, 171 F.3d at 427-28. The state circuit court found that appellate counsel's performance was deficient because he omitted the excluded-evidence issue. This Court has little quarrel with that proposition; the issue was "significant and obvious," "clearly stronger than those presented," "objected to at trial," and "the decision to omit [the] issue [was] an unreasonable one which only an incompetent attorney would adopt." *See ibid.* It is not so certain, however, that including the issue would have resulted in a reversal and new trial. *See Smith v. Robbins*, 528 U.S. at 285 (requiring the petitioner to show that "but for his counsel's unreasonable failure . . ., he would have prevailed on his appeal").

It is true that the petitioner preserved his objection to the exclusion of evidence by a timely objection. However, in Michigan, a preserved evidentiary error warrants reversal only where the defendant overcomes the presumption that the error was harmless, that is, it is more probable than not that the error affected the outcome. Mich. R. Evid. 103; *People v. Lukity*, 460 Mich. 484, 495-496, 596 N.W.2d 607, 612-13 (1999). The Michigan courts are reluctant to find reversible error in the exclusion of defense evidence when the evidence is "cumulative," that is, when the proposition

-25-

has been proved by other evidence admitted at trial. *See People v. McLaughlin*, 258 Mich. App. 635, 652-57, 672 N.W.2d 860, 872-74 (2003).

In this case, the Michigan Court of Appeals found that the excluded evidence was cumulative. The petitioner argues that this conclusion is not entitled to deference. However, this Court has reviewed the evidence presented at trial, as discussed above, and concluded that the state court of appeals's conclusion does not amount to an unreasonable determination of the facts. Therefore, there is no certainty that admission of the excluded evidence would have influenced the jury's verdict, or that the evidentiary error was "prejudicial," as that term is understood by the state appellate courts. Because the error in excluding the evidence likely would not have led to a reversal of the conviction on direct appeal, the petitioner is not able to establish the prejudice prong for ineffective assistance of appellate counsel. Therefore, he is not entitled to a writ of habeas corpus on that ground.

III.

The Court finds that the state courts' decisions in this case were not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts. Therefore, the petitioner has not established that he is presently in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that his petition for a writ of habeas corpus [dkt # 1] is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   February 25, 2009

-26-

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 25, 2009.

s/Felicia M. Moses
FELICIA M. MOSES